633 So.2d 871 (1994)
Wilmer CHAMBERLAIN and Beverly Leblanc Chamberlain, Individually and on Behalf of Their Minor Son, Chad Anthony Chamberlain
v.
STATE of Louisiana, THROUGH the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, and ABC Lighting & Electrical Contractors, Inc.
No. CA 91 1942R.
Court of Appeal of Louisiana, First Circuit.
March 11, 1994.
*872 William A. Porteous, III, New Orleans, for plaintiffs-appellees, Wilmer Chamberlain et al.
Stephen R. Callahan, Houma, for defendant-appellant, State of La. Dept. of Transp. and Development.
Estelle E. Mahoney, Houma, for intervenor-appellant, Louis J. St. Martin.
Before FOIL, PITCHER and PARRO, JJ.
FOIL, Judge.
This case arose out of a near-drowning incident in which Chad Chamberlain suffered extensive injuries. DOTD's liability for those injuries has been previously established. Chamberlain v. State of Louisiana, Department of Transportation and Development, 621 So.2d 1118 (La.App. 1st Cir.), writ denied, 615 So.2d 334 (La.1993). However, the quantum issue raised in that appeal was only addressed in the context of the $500,000.00 statutory limitation on the State's liability for general damages found in La.R.S. 13:5106(B)(1). In Chamberlain v. State of Louisiana, Department of Transportation and Development, 621 So.2d 1118 (La.App. 1st Cir.), reversed and remanded, 624 So.2d 874 (La.1993), this court ruled that the statutory cap was constitutional, and also addressed DOTD's argument that the trial court's award of $500,000.00 for Chad Chamberlain's general damages and his parents' loss of consortium claims was excessive. This court upheld the $500,000.00 general damage award, finding that the evidence clearly established that the claims, taken together, exceeded the liability limitation.
The Louisiana Supreme Court reversed this court's ruling on the constitutionality of the cap in Chamberlain v. State of Louisiana, Department of Transportation and Development, 624 So.2d 874 (La.1993). The Court remanded the case to this court to address the quantum of the plaintiffs' general damages in the amount of $2,000,000.00 as itemized by the trial court, and to enter an amended judgment awarding general damages consistent with that review and the Court's opinion. Id. at 888.

GENERAL DAMAGES
On June 13, 1987, seventeen-year-old Chad Chamberlain almost drowned and sustained devastating mental and physical injuries *873 as a result. The evidence established that he is in a vegetative state both mentally and physically. He is unable to move on his own accord and someone must tend to his every need. Chad was described as having the mental capacity of a two-week-old infant. As we noted in our original opinion, the expert testimony established that Chad does feel pain, especially when exposed to painful stimuli, such as his therapy sessions which he must endure for three hours every day. However, Chad's ability to remember a painful incident is simply nonexistent.
Although the trial court applied the statutory cap to limit Chad and his parents' recovery for general damages to $500,000.00, the court did set forth in written reasons the amount it would have awarded if the cap was not in effect. The court itemized Chad's general damage claims, and his parents' loss of consortium claims as follows:

1. Past mental pain and fright $200,000.00
2. Past and future pain and discomfort $200,000.00
3. Disability $500,000.00
4. Past and future loss of decent quality
 of life $500,000.00
5. Past and future mental suffering $200,000.00
6. Loss of consortium to Mrs. Wilmer
 Chamberlain $200,000.00
7. Loss of consortium to Mr. Wilmer
 Chamberlain $200,000.00

DOTD attacks the awards for mental pain and past and future pain and suffering on the basis of the severity of Chad's mental injury, arguing that the medical evidence showed that Chad cannot suffer or appreciate pain in the conventional sense. DOTD also challenges the award for past mental pain and fright as speculative because it was not known how long Chad remained conscious under water. Finally, DOTD asserts that Louisiana law does not allow recovery for loss of a decent quality of life and even if such recovery is authorized under the law, the award is contrary to the medical evidence suggesting that Chad lacks the cognitive functions to understand the loss of the quality of his life.
Because we have the benefit of the trial court's determination as to what amount it would have awarded in general damages based on the evidence if the cap were not in effect, we shall review the general damage award utilizing the standard of review set forth by the Louisiana Supreme Court in Youn v. Maritime Overseas Corporation, 623 So.2d 1257 (La.1993). In Youn, the Court made it clear that the discretion vested in the trier of fact in assessing general damages is great and even "vast," so that an appellate court should rarely disturb an award of general damages. An appellate court should increase or reduce an award only when that award is beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances. Youn v. Maritime Overseas Corporation, 623 So.2d at 1261.
The trial court gave excellent written reasons in fixing general damages. Our record review establishes that those reasons are amply supported by the evidence presented in this case, and we find no abuse of the trial court's vast discretion in fixing the general damage awards. We cannot conclude from the entirety of the evidence in this case, viewed in the light most favorable to the plaintiffs, that a rational trier of fact could not have fixed the awards at the level set by the trial court, or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." Youn v. Maritime Overseas Corporation, 623 So.2d at 1261, quoting Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987). Accordingly, we award general damages to plaintiffs in the amount of $2,000,000.00, and we adopt the trial court's written reasons as our own in entering the award. A copy of the trial court's written reasons for judgment is attached hereto as Appendix A.[1]

INTEREST
The Chamberlains present an issue on remand regarding the amount of interest *874 awarded by the trial court. The trial court entered judgment "with legal interest from judicial demand until paid." The Chamberlains contend that the judgment awarded legal interest in accordance with La.Civ. Code art. 2924, which sets the legal rate of pre-judgment interest at 12%. However, La.R.S. 13:5112 C specifically provides that the rate of pre-judgment interest in suits against the State is 6%. Plaintiffs contend that if La. R.S. 13:5112 C sets the rate of interest, that provision is unconstitutional for the reasons set forth by the Louisiana Supreme Court in Chamberlain v. State, Department of Development and Transportation, 624 So.2d 874 (La.1993).
The plaintiffs did not challenge the constitutionality of the interest limitation in the trial court, nor did they raise the issue in the initial appeal. DOTD did not plead the statute as a defense in the trial court. This issue is presented to this court for the first time in this remand.
DOTD asserts that the plaintiffs are precluded from challenging the constitutionality of the statute for the first time on appeal because they failed to raise the issue in the trial court. It is true that as a general rule, the constitutionality of a statute must first be questioned in the trial court, not the appellate court. Rogers v. Synthes, Ltd., 626 So.2d 775 (La.App. 2d Cir.1993). However, in a case recently decided by the Louisiana Supreme Court, a plaintiff was allowed to challenge the constitutionality of the interest provision even though the issue was not raised in the trial court. Rick v. State of Louisiana, Department of Transportation and Development, 630 So.2d 1271 (La.1994). In Rick, the Supreme Court noted that DOTD did not rely on the statute in the trial court. In the present case, DOTD similarly failed to assert the statute, and relies on the limiting provision for the first time in this appeal. Under Rick, this court must address the constitutionality of the statute.
In Rick, the Supreme Court held that the interest provision was unconstitutional for the reasons set forth by the Court in Chamberlain. Accordingly, because the statute has been declared unconstitutional, plaintiffs are entitled to legal interest at the rate provided for in La.Civ. Code art. 2924. We clarify the judgment to reflect that pre-judgment interest is set at the rate provided for in La.Civ. Code art. 2924.

CONCLUSION
Based on the foregoing, we amend the judgment of the trial court and enter an award of general damages in favor of plaintiffs in the amount of $2,000,000.00, in accordance with the total amount found by the trial court in the attached opinion. We clarify the judgment of the trial court to reflect that interest on the judgment is set at the rate provided for in La.Civ. Code art. 2924. All costs of this appeal, in the amount of $1,056.50, are assessed to the State of Louisiana, Department of Transportation and Development.
AMENDED AND RENDERED.

APPENDIX A

Wilmer Chamberlain,

et al.

v.

State of Louisiana,

Through the Department

of Transportation

and Development, et al.

NO. 88836

32nd Judicial District Court

Parish of Terrebonne

State of Louisiana

REASONS FOR JUDGMENT

HISTORY OF PROCEEDING
This personal injury action was filed by the plaintiffs, Wilmer Chamberlain, Beverly Chamberlain, individually and on behalf of their minor son, Chad Anthony Chamberlain, against the State of Louisiana, through the Department of Transportation and Development and ABC Lighting and Electrical Contractors. The plaintiffs filed this action as a result of injuries suffered by Chad Chamberlain *875 on June 13, 1987. The State filed a Motion for summary judgment which was referred to the merits. The only remaining defendant is the State of Louisiana. Trial was held on five different days over a period of four months. The Court this date renders judgment and assigns reasons therefor.

FINDINGS OF FACT
On June 13, 1987 Chad Chamberlain, Mark Arceneaux and Pete Desselle, all high school classmates, went swimming in the Houma Canal, a tributary between Bayou Black and the Intracoastal Waterway within the city limits of Houma, Terrebonne Parish, Louisiana. Nolan Bergeron, another classmate accompanied the other three but did not participate in the recreation. The three young men were swimming from and around a bridge owned by the State of Louisiana and maintained by the Department of Transportation and Development.
As the afternoon of June 13th passed, Chamberlain, Arceneaux and Desselle began playing a school yard contest, the intent of which was to determine who could secure control of a certain area. To control and defend the area each would try to evict the others by pushing and shoving them from that area. In this instance the territory was one of two of the bridge's fenders, a bulk head type of device built parallel to the bank of the canal. The fenders were originally constructed to create a channel in the canal and to protect the bridge from vessels in navigation. The Houma Canal was little used for marine traffic and at the time of the accident this bridge had been unmanned for at least two years.
The contest's victor on this occasion was Pete Desselle. He successfully threw the other two men, Arceneaux and Chamberlain, from southwest bridge fender. Mark Arceneaux was thrown toward the middle of the canal. Chad Chamberlain put up a struggle with Desselle and was tossed between the bank of the canal and bridge fender. The depth of the water in the middle of the canal was estimated at ten feet. The depth between the fender and the bank range from two to three feet at the bank itself to five to six feet near the fender. This was best evidenced by plaintiff's exhibit 34.
By the time Arceneaux had made his way back to the fender, Desselle had walked along the fender underneath the bridge to make his way to the top of the bridge structure. Arceneaux noticed Chamberlain had not surfaced after being thrown in. Arceneaux yelled at Desselle informing him of this fact. Desselle retraced his route to where Chamberlain was thrown in. Both young men informed Bergeron what had happened.
Desselle and Arceneaux entered the water on the channel side of the fender and proceeded around the western end to look for Chamberlain between the fender and the bank. As Desselle moved forward toward the area Chamberlain had entered the water, he informed Arceneaux he felt an electric shock which got stronger as he went forward.
In the meantime, Bergeron ran across the street to a nearby Fire Station located 60 feet from the bridge. Bergeron found Fireman Danny Hebert and informed him of the incident. Hebert informed Camille Duplantis, his captain, and both immediately ran to the bridge. When the firemen reached the bridge, Desselle informed them immediately that he felt electricity in the water. Captain Duplantis promptly had the power to the bridge terminated. With the power off and rescue units on the way, the search for Chamberlain proceeded without further encountering any electric shock. Chamberlain was located by Fireman Danny Hebert. Police Officer Kelly Massa found Chamberlain lying length-wise underneath the bridge fender in a small trench in the canal bottom.
The exact amount of time Chamberlain was in the water is not known. Estimates from witnesses range from fifteen to twenty minutes. Paramedics were on the scene when Chad was pulled from the water. Resuscitation efforts commenced immediately and the attempt proved to be successful. Chamberlain, however, suffered severe hypoxic brain damage due to the near drowning. His injuries will be addressed in more detail, infra.

*876 MOTION FOR SUMMARY JUDGMENT
The State, on December 5, 1988, filed a Motion for Summary Judgment on grounds that the plaintiffs had no cause of action pursuant to LSA-R.S. 9:2791. This motion was referred to the trial on the merits.
In its findings above, the Court has determined that Chamberlain was injured while swimming and diving from and around the bridge which is owned and maintained by the State. The State contends that such activity falls within the activities enumerated in 9:2791 and 9:2795 that provide limited liability to landowners who provide their land for recreational purposes.
The purposes of the statute was to "confer immunity upon landowners of undeveloped, non-residential rural or semi-rural land areas. The size, naturalness, remoteness and insulation from populated areas all attribute to the categorization of the property as rural or semi-rural". Keelen v. State, 463 So.2d 1287 (La.1985). The Supreme Court further described two factors to consider when determining whether the limited liability is applicable to a certain set of facts.
1) The property where the injury occurred must be an undeveloped, non-residential rural or semi-rural land area; and
2) The injury itself must be the result of recreation that can be pursued in the true outdoors. Ratcliff v. City of Mandeville, 502 So2d 566 (La.1987).
The accident occurred within the city limits of Houma. It is adjacent to U.S. Highway 90 some miles before the highway exits the city limits. The thoroughfare is well travelled and heavily used. Across the street from the accident site, is a private golf club, much used by Houma's citizens. Within blocks of the bridge is residential housing. The Court necessarily finds that this area is not a semi-rural or rural area as defined by the jurisprudence. See Socom [Socorro] v. Orleans Levee Board, 561 So2d 739 (La.App. 4th Cir.1990).
Having found that the area is urban, the Court will forego the determination of whether the injury was the result of recreation normally found in the "true outdoors". Ratcliff, supra.

THE CAUSE OF INJURY

A. THE ELECTRICAL LEAK
Plaintiffs allege that the electricity felt by Arceneaux and Desselle was instrumental in bringing about the severe injuries suffered by Chamberlain.
The parties hired expert electrical engineers to determine whether there was an electrical leak into the canal from the bridge and, if so, its source. Robert Alonzo, the plaintiffs' expert engineer testified as to the possibility that the water in the canal near the navigation light on the southwest bridge fender was energized.
Alonzo concluded that there was an electricity leak in the area due to the condition of the wiring. Electricity to the bridge was supplied via wire cable to an electric meter located on the bridge house across the canal and on the opposite of the bridge from where the incident occurred. A submarine electrical cable supplied the southside navigation lights on the southern bridge fender. The cable entered a junction box and from there branched to the eastern and western ends of the southern bridge fender to two navigation lights. [1] [There was a third navigation light in the middle of the southern bridge fender, however, its wires were cut and it was removed prior to the accident. Alonzo determined that this had no bearing on the manner that the electric current entered the water.] The only two conductor cables leading to the junction box and then to the lights were a hot conductor and a neutral conductor. These conductors were insulated and both were incased in a lead sheath over which metal tape was wrapped.
Each navigation light was originally designed to receive 120 volts of electricity. Alonzo and Dr. Patton, the defendant's expert electrical engineer, both testified that given the condition of the system at the time of the accident, it was possible for current could flow to the light on the eastern side of the southern fender, back through the junction box and out to the western end navigation light. At one point between the junction box and the southwest navigation light there was *877 a fault in the wiring. A hot cable was broken. The neutral cable and the lead sheathing, however, were continuous. The break in the hot conductor is clearly shown in plaintiffs' exhibit 31.
Alonzo's theory as to how the electrical current leaked into the water is as follows:
1. The current originated from the power source to the junction box on the southern bridge fender;
2. The current then travelled to the southeast navigation light along the hot conductor wire;
3. The current energized the neutral conductor wire back to the junction box;
4. The neutral jumper within the junction box was broken and the current could not flow back to the power source completing the circuit but instead energized the neutral conductor leading to the southwest light;
5. This created a series electrical circuit as opposed to the originally intended parallel electrical circuit and thus decreased the voltage from 120 volts to each light to 60 volts to each light;
6. Due to the break in the hot conductor leading from the junction box to the southwest navigation light, the only energized conductor to that light was the neutral conductor that was continuous;
7. As the current proceeded via the neutral conductor to the southwest light it passed through the light energizing the formally hot conductor at the light and attempted to proceed back to the power source via that hot conductor to complete the circuit;
8. The former hot conductor between the southwest light and the previously described fault shown in plaintiff's exhibit 31, energized the lead sheathing at the point of the fault;
9. It was the energized lead sheathing that made contact with the water effectively grounding the circuit at the location of the accident.
In order for this theory to work each light fixture on the southern bridge fender must be operational with working light bulbs to complete the circuit. This fact was confirmed by Patton. Alonzo testified that there was a light bulb in the southwest light fixture at the time of the accident. The defendant objected to this testimony as well as the introduction of the light bulb because the State did not have prior knowledge the bulb existed. The plaintiff, Wilmer Chamberlain, and Leonard Pizzolatto, an electrician hired by plaintiffs' former counsel, both testified that they witnessed plaintiffs' former counsel, Louis St. Martin, having removed the light bulb out of the southwest light fixture on June 17, 1987. Mr. Pizzolatto appropriately marked the bulb with his initials and dated it after it was removed.
The State objected to the evidence on prejudicial grounds in that the State had no prior knowledge of the bulb's existence until the date of trial. The Court found that the State did not seek discovery of the existence of any light bulb. No one asked the plaintiffs if anything was secured from the accident site by them. In fact, plaintiffs's current counsel, did not know of the bulb's existence. The Court finds there was indeed a bulb in the southwest light fixture on June 17, 1987, and by a preponderance of the evidence, that the bulb was in that light fixture on June 13, 1987, the date of the accident.
Dr. Patton verified that Alonzo's theory could work if the bulb was in fact in place and functional. Further, no lights would work unless both lights were functional. The Court is also satisfied that Fireman Camille Duplantis and Fireman Danny Hebert saw at least one functional light on the southern bridge fender. This light was just in back of the Fire Station on the same bank where the accident occurred but on the eastern end of the fender. Mr. Duplantis indicated on plaintiffs' exhibit 52-C which light he observed as functioning. This gives credence to the theory that the series circuit, if converted as Alonzo testified, was function.
Furthermore, the Court was impressed by the testimony of Arceneaux, Bergeron and Desselle as well as that of Fireman Duplantis and Hebert, as to what occurred as soon as Chamberlain was discovered as being in distress. The Firemen were contacted by the youths for assistance. The first thing Desselle *878 told them was that he encountered an electric current in the water. It would be difficult for this Court to believe that Desselle concocted this story at a time when he discovered his friend missing beneath the water's surface. Presented with this chain of events and in light of the above, the Court finds that based upon a preponderance of the evidence, the water was energized by an electricity leak into the canal at the location of the accident.

B. THE EFFECT OF THE ELECTRICITY
Mr. Alonzo and Dr. Patton both testified as to the possible consequences a swimmer or diver would suffer when encountering various amounts of electricity while in water. The parties also introduced the testimony of two immensely qualified doctors. Dr. Keith Van Meter, M.D., testified on behalf of the plaintiffs, and Dr. Glen Egstrom, Phd., was offered as an expert for the defendant.
The estimates of how much electricity entered the water range from 180 miliamps to 20 miliamps. Dr. Patton conducted a specific test with the materials at the accident site. He testified that if electricity leaked into the water in the manner suggested by Mr. Alonzo the intensity most likely would be 20 miliamps. He further testified that a person in close proximity to such a discharge would be in a dangerous position. Mr. Alonzo testified that the let go "threshold" of an electric current would be 9 miliamps. Any harsher charge could result in ventricular fibrillation and/or cardiac arrest. This data was supported by Dr. Egstrom, a kinesiologist and underwater accident reconstructionist.
Dr. Egstrom testified that in his opinion, based upon Dr. Patton's testimony, that Chamberlain most likely became entangled within the bridge fender structure while swimming underwater. His position was based upon Dr. Patton's estimation of the amount of electricity one would encounter near the navigational light. Dr. Egstrom was mistaken as to that amount. Dr. Patton estimated 20 miliamps in the water, but the electrode he used was immersed 9 feet from the light on the mistaken belief that the source of electricity entered the water where the hot wire was broken. He therefore estimated the amount of electricity near the light was much less than 20 miliamps. Chamberlain was found right next to where the electricity actually entered the water. The full force of the electricity was where Chad Chamberlain was found. Dr. Patton concluded that Chamberlain was found some 9 to 10 feet from the electrical source. Dr. Egstrom based his conclusion on this erroneous assumption.
Dr. Van Meter, an expert in hyperbaric medicine and emergency medicine, testified at length as to the results of encountering an electric field by a diver. His conclusions, based on numerous treatment of persons who had encountered an electric field in water, included complete disorientation, vertigo, ventricular fibrillation and possibly seizure due to an affect to the central nervous system. If Chamberlain encountered as little as 20 miliamps of electricity serious consequences could result.
Dr. Egstrom also testified that in his opinion Chamberlain was trapped in a 28 inch wide space within the fender system. Egstrom also said Chamberlain would be panic stricken and would thrash about before succumbing to asphyxiation. If Chamberlain did thrash about with the intensity described by Egstrom in that small cagelike space there would be some signs of injury to his body in the form of abrasions and contusions. No such injury was found on his body. It is unlikely that would be the finding if the incident occurred the way Dr. Egstrom postulates.
Considering all of the testimony by these well qualified experts as a whole, the Court finds that the electricity leak was the major cause in fact of the injuries suffered by Chad Chamberlain.

CONSTRUCTIVE NOTICE
The Court necessarily finds that the injury was caused by the disrepair of the navigation light wiring on the Houma Canal Bridge. The State owned the bridge and the department in charge of the inspection and maintenance of the structure was Transportation and Development, a state agency.
*879 Plaintiffs' exhibit 42 is a compilation of bridge inspection reports that were performed at least every two years. The reports on the navigation lights are given a rating from 0 to 9. A critical rating would be given a 0, 1 or 2. Ratings 3, 4 and 5 are poor ratings. From the reports entered into the record, at no time between 1981 and 1987 have the navigation lights on the Houma Canal Bridge been rated higher than poor. In 1981 and 1982 the lights were rated critical. In 1983 the lights were upgraded from critical to poor. In June of 1987, 4 days after the accident, the navigation lights were given a 3 rating. This is the lower end of the poor rating on the scale.
The particular junction box where the problems pertaining to this accident originated, could not even be inspected. The experts that testified, had to destroy the cover of the junction box to look inside and discover the fault that began the unfortunate series of events that caused Chamberlain's injuries. Yet 13 days prior to the inspection by the parties' experts, an inspection report was generated that made no indication the junction box and its interim was deteriorated. Further, the comments on the June, 1987 report, 4 days after the accident, indicated that there was no change since the last report exactly one year earlier.
The State therefore had actual knowledge of the bridge's condition and admitted that condition existed for at least one year after the accident. This deteriorated condition was a cause in fact of Chamberlain's injuries.

WARNINGS
Further, the State knew of the condition and, according to the Department of Transportation and Development engineer, Mr. Wyble, the State encouraged swimming and recreational activities near and under the bridge. The State knew or should have known that a swimmer near the bridge may get tired, and that there was a likelihood that the bridge fenders in the canal would be used for support by that tired swimmer and/or be climbed upon by swimmers encouraged to be in that area.
The only signs warning and/or informing the public not to swim or dive from the bridge faced away from and across the road from the lateral roadside park where most, if not all, recreational activities in the area originated. The Court finds there were no adequate warning signs by the State to the public pertaining to the hazards the State knew or should have known would be encountered by that public.

CONTRIBUTORY NEGLIGENCE OF THE PARTIES
Finally, the DOTD, in its pleadings raised the issue of victim fault. Without repeating all the evidence, suffice it to say that this Court finds no fault on the part of Chad Chamberlain which led to his present tragic condition. The electrical shock which this Court is convinced that Chad received was the proximate cause of his injury. This was a dangerous and unseen tap which the ordinarily prudent person, under like circumstances, could not have discovered or foreseen. It is reasonable, when diving or jumping into murky water, to foresee that one may be injured by submerged objects or a shallow depth. Under the instant circumstances one does not expect to be electrocuted by entrance into the water. Admittedly, the horseplay in which Chad and his friends were engaged caused Chad to be in the water at that particular location. However, the horseplay was not the cause of Chad's resulting injury, but, rather the electrical shock which would not be anticipated. Fortunately, one of the boys searching for Chad in the water felt the electrical charge at its weakest point as he approached the fatal area or he, too, may have been injured. Even if Chad had intentionally entered the water where he did with slow and deliberate caution the same result would probably have ensued.
The further contention by the defendant, DOTD, that Pete Desselle was a cause of Chad's injury is without merit. The evidence is unclear whether Chad was pushed into that particular spot by Pete Desselle or whether Chad lost his balance while wrestling with Desselle. In any event, neither young man could have foreseen that someone would be electrocuted any more than could a *880 passing fisherman or pleasure boatist who may have put his hand into the water at that spot and been injured.
It has been discussed earlier that there were adequate warnings to the public. It was pointed out by defendant, DOTD, there was a sign posted which prohibited swimming from the bridge. However, the particular sign in question was on the opposite side of the bridge and away from the accident site. Further, Mr. Francis Wyble, who was the engineer in charge of roads and bridges in Terrebonne Parish on behalf of DOTD testified that the sign regarding swimming was placed there to prohibit swimmers and divers from creating a hazard to the motoring public using the bridge and not persons who might be swimming from the bridge. In this Court's opinion, Mr. Wyble's testimony, effectively dispels this particular defense.
In summary the Court finds no comparative negligence on the part of Chad Chamberlain nor any culpable negligence on the part of Pete Desselle.
The next issue is that of damages which Chad Chamberlain suffered as a result of this unfortunate accident.
From the testimony at trial, it appears that Chad remained submerged for fifteen to twenty minutes without the benefit of oxygen. For some inexplicable reason, when Chad was removed from the water he was resuscitated and sent to Terrebonne General Hospital where he was placed on life support and his condition stabilized. Tragically Chad's brain was all but destroyed. Although his involuntary system, still for the most part functions, his voluntary system has completely failed. Chad cannot voluntarily move his limbs or any other part of his body. What movements he has are merely reflexive in nature. He cannot swallow and must be fed for the rest of his life on a tube placed in his stomach. He cannot cough to clear his lungs and must be mechanically suctioned out on a constant basis. He cannot control the elimination of wastes from his body. He is absolutely helpless and must be cared for by others. Chad is believed to have no long term or short term memory. He has no cognitive powers, no ability to understand and reason. His mental state has been described as that of a two week old infant with no improvement in sight. Chad is believed to be unable to even understand that his parents are caring for him night and day. He probably cannot remember his past, nor can he contemplate his future. He is however, physically rather healthy, and physicians agree, that with the best of care Chad would live to be 55 to 60 years old, but never improving from his present vegetative state. In this Court's opinion, the only injury which would have been greater in magnitude would have been death, itself.
Regarding the general damages suffered by Chad Chamberlain, the Court feels that these general damages should be broken down into the following elements:
1. Past mental pain and fright.
2. Past, present and future physical pain and discomfort.
3. Permanent disability.
4. Past, present and future loss of a descent quality of life.
5. Past, present and future mental suffering.
However, before particularizing the general damages, the Court will briefly discuss the issue raised by the defendant as to the limit of liability imposed by La.R.S. 13:5106 B(1) and the plaintiff's opposition on constitutional grounds.
La.R.S. 13:5106 B(1) reads as follows:
"In any suit for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings and loss of future earnings as provided in this Section, shall not exceed five hundred thousand dollars."
In a very detailed and scholarly brief the constitutionality of the "$500,000.00 cap" was questioned on more than one basis. This Court would agree that the limitation certainly discriminates against those whose injuries exceed that limitation. It likewise discriminates against we ordinary citizens of this state who are all potential tort feasors and who have not been fortunate enough to attract the favor of our legislature. Plaintiffs cite Sibley v. Board of Louisiana State University, *881 477 So.2d 1094 in support of their argument. This Court would agree that in the language of "Sibley" relative to the issue of limitation of liability, the Supreme Court goes to great length to imply that the statute is unconstitutional and discriminates against a special class of persons. Nevertheless, the Court refused to render a judgment to that effect and the case was eventually remanded back to the district court for its determination of constitutionally of the statute. The case was then compromised and the issue became moot. This Court is not privy to the reasoning of the Supreme Court in not making the determination of constitutionality itself when it certainly had the power to do so. There has been ample opportunity since "Sibley" for the Supreme Court to declare La.R.S. 13:5106 B(1) unconstitutional, it has yet to do so.
Plaintiffs next argue that the subject statute denies the right to adequate remedy to victims of torts. This Court would agree if the total amount of the damages was limited to only $500,000.00 including so called special damages such as past and future medical care and past and future loss of income. However, the legislature did not make that limitation. Special damages have no limitation. The legislature only sought to limit what has always been considered the most arbitrary of the damage awards, that of general damages. This Court believes the legislature has the power limit liability as long as it does not totally abolish the remedy for tortuous conduct.
The final argument of the plaintiffs is that the legislature has, in effect, infringed on the judicial function. This is, and will remain, a continuing problem between the three branches of government. One branch always seems to overlap into the domain of the other and this is, though undesirable, an unavoidable happening. It is the legislative function to make the laws. By enacting R.S. 13:5106 B(1) the legislature has set parameters on the general damages which the Court may award. It has not abolished the Court's duty to make an award if the Court sees fit. When the legislature created the remedy of Workmens Compensation, it set the parameters of damage awards which the courts may work within and this has stood the constitutional test. Likewise, the courts, have by judicial decrees, created laws where no laws existed before. This has certainly overlapped into the powers and duties of the legislature. This Court is not persuaded by the argument.
As previously stated, the Supreme Court of this State has not yet rendered a final judgment declaring R.S. 13:5106 B(1) unconstitutional and until such time as it does, this Court will abide by the dictates of the legislature.
However, in the event that the appellate courts should decide that R.S. 13:5106 B(1) is unconstitutional for whatever reason, this Court feels it is its duty to indicate what the court would award as general damages if there were no limitation, for whatever future use it may be. Once done, the Court will make an award for general damages in the proportions as they apply to the $500,000.00 limitation.
In the instant case, this Court feels the following are elements of general damages which Chad Chamberlain suffered and will in the future suffer:
1. Past mental pain and fright.
2. Past, present and future physical pain and discomfort.
3. Disability.
4. Past, present and future loss of a descent quality of life.
5. Future mental anguish (anxiety).

1. Past mental pain and fright.
Although the expert testimony indicates Chad is believed to be unable to remember anything of his pre-accident life, he did in fact, for all practical purposes drown. There is no evidence that he was knocked unconscious upon entering the water. There were no bruises or abrasions about his head or other parts of his body. There is no evidence that the electrical charge caused him to lose consciousness. On the contrary, the consensus of the expert opinion was that the electrical charge received, in some way, caused disorientation which prevented his escape to the surface and led to his drowning. *882 When brought to the surface he had no heartbeat and was, for practical purposes dead for fifteen to twenty minutes. There is no doubt in this Courts mind that at some point in his struggle in the water, the realization came to him that death was certain. This had to be a terrifying experience to a young person, with his whole life ahead of him, for whatever time it took before he lost consciousness. Our law contemplates recovery for these frightening moments of pain and struggle to those persons, who subsequently die, through the vehicle of the survivor action. Is Chad to be denied this element of recovery because he died and was revived and now cannot remember the horror he must have felt? The Court thinks not. There is no more speculation in this award then there would be in an award in a survivor action where a person remained dead. The Court would award the sum of $200,000.00.

2. Past, present and future pain and discomfort.
Here again the experts are understandably uncertain. They all agree that Chad "probably" feels no pain in the sense that he cannot remember and reflect upon the pain. Nevertheless, the evidence is clear from the medical testimony that there is a reflexive action to pain stimulus which when induced, Chad reacts with facial expressions and increased muscle tone. This reaction to pain has been expressed by Dr. Glynn as being similar to that of an infant. The infant feels the stimulus, reacts to it, but "apparently" cannot remember the incident at a later time. No one would deny that infants feel pain and discomfort. This Court is convinced that Chad, regardless of the level, feels pain and becomes uncomfortable. Every time Chad is given physical therapy, which he will receive the rest of his life, he often reacts to what this Court feels is painful stimulus whenever the limits of extension or flexion are exceeded. Because of this frequent and continued therapy and resulting pain, the Court would award $200,000.00.

3. Disability.
Any disability suffered by an injured party at the hands of another is compensable regardless of how minimal. This Court cannot conceive of anyone more disabled than Chad Chamberlain. He has lost the ability to care for himself in any way whatsoever both from a physical as well as a mental standpoint. Chad has suffered the ultimate disability for a living human being and is entitled to be compensated in the amount of $500,000.00.

4. Past, present and future loss of a decent quality of life.
What about the quality of life Chad has been deprived of that he can never again enjoy? The doctors contend that Chad will never improve from the vegetative state he now endures. Yet, they are not certain whether Chad can or cannot realize his fate. They all agree that they do not "think" he realizes it, but of course, are not certain. Chad must now go through his lifetime without any interaction with the human as well as all other physical aspects of his environment. Yet, Chad is alive and will in all probability stay alive for many years to come. This loss should be compensated as are all other damaged plaintiffs who are not nearly as severely impaired. The Court would award $500,000.00.

5. Past, present and future mental suffering.
Although, as stated above, Chad has been described as being vegetative, both physically and mentally with no long term memory, it is documented by his doctors, Dr. Glenn in particular, that Chad does respond to certain adverse stimulus. He demonstrates a certain degree of anxiety. This mental state is certainly recognized to be discomforting as a general rule. Chad manifests this condition under such situations as his reaction to strangers, or loud noises, or probable pain brought on by exercises. Chad reacts to this stimulus by facial expressions and pronounced, increased muscle tone. What sets this apart from the previously discussed pain he suffered, is that Chad's reduced mental capacity inhibits him from adjusting and coping with what, to him are stressful situations. This stress is real even though he cannot remember the individual incidents at all. Anxiety is discomforting even in the most *883 primitive intellects and is compensable because in Chad's case it will last his lifetime. The Court would award $200,000.00.
This Court recognizes the claim for loss of consortium which the parents, Mr. and Mrs. Chamberlain, have. In such a catastrophic situation the evidence is clear that both Mr. and Mrs. Chamberlain have had a complete change in their lifestyles due to the injury to their son Chad. His care at home has been, and is presently, a twenty-four hour per day ordeal. Mr. Chamberlain has had to modify the family home to accommodate Chad to a more hospital-like setting. Mr. Chamberlain was also forced to give up his fishing business so that he could be more readily available at all times during the day and night. Mrs. Chamberlain has, since the accident, devoted her entire life to the care of Chad, as well. This has occurred at a time in their lives when, under normal conditions, their son would, in all likelihood, have left home to make his own way and build a life for himself. A time when most parents of grown children have earned time to devote to themselves and to enjoy what pleasures their labors have provided. As a result of this tragedy, both Mr. and Mrs. Chamberlain have found themselves more confined and inhibited than caring for a newborn, because Chad's care is infinitely more physically and mentally demanding. Most of all, they have been deprived of the reciprocal love and companionship of their only child which can never be replaced. Chad cannot respond to their care, their patience and their love which they will continue to give to Chad as long as he lives. The Court feels an award of $200,000.00 to each parent would be minimal under the circumstances.
The Court has reviewed the claim made by Mr. and Mrs. Chamberlain for the mental pain and anguish they have suffered as a result of Chad's injuries. This Court can only speculate on the magnitude of their anguish. However, having carefully reviewed the guidelines set out in the holding by the Supreme Court in "Lejeune", the instant case falls short of those factors enumerated which are required before an award can be made. In the instant case, neither parent was there when the accident occurred or shortly thereafter. However, Mrs. Chamberlain did go to the hospital as soon as notified and there was no substantial change in Chad's condition. Mr. Chamberlain was offshore at the time and he arrived as soon as transportation could be obtained. There is no question that the injury to Chad was of such gravity to cause serious mental distress to both Mr. and Mrs. Chamberlain and that reaction would certainly be foreseeable. However, under "Lejeune" the emotional distress must go far beyond mental pain and suffering to such an extent as to be seriously debilitating. There was no medical evidence that such was the case. To the credit of both Mr. and Mrs. Chamberlain, they have both been able to function and provide care for Chad indicating strength and character which, regretfully, this Court can only admire and applaud rather than compensate.
The plaintiffs also make the argument that there are, in effect, three claims, for Chad, for Mr. Chamberlain, and for Mrs. Chamberlain even if the limitations of R.S. 13:5106 B(1) should apply. The Court cannot agree with this premise, under the wording of the statute which reads in part.
"In any suit for personal injury, the total amount recoverable ........ shall be five hundred thousand dollars."
The loss of consortium as well as the general damages to Chad are still "one claim" subject to the single limit of $500,000.00.
As stated before, the above awards are given as the minimum amount this Court would assign were it not for the limitation of R.S. 13:5106 B(1) and are recapitulated as follows:

1. Past mental pain and fright $200,000.00
2. Past and future pain and discomfort $200,000.00
3. Disability $500,000.00
4. Past and future loss of a decent
 quality of life $500,000.00
5. Past and future mental suffering $200,000.00
6. Loss of consortium to Mrs. Wilmer
 Chamberlain $200,000.00
7. Loss of consortium to Mr. Wilmer
 Chamberlain $200,000.00
 _____________
 TOTAL $2,000,000.00

In order to comply with the limitation of $500,000.00, on all of the above awards, the Court has taken the percentage of each of the above elements are to the total of $2,000,000.00 *884 and applied those percentages to the limit of $500,000.00 to give the actual recapitulation of general damages as follows:

1. Past mental pain and fright $ 50,000.00
2. Past and future pain and discomfort $ 50,000.00
3. Disability $125,000.00
4. Past and future loss of a decent quality
 of life $125,000.00
5. Past and future mental suffering $ 50,000.00
6. Loss of consortium to Mrs. Wilmer
 Chamberlain $ 50,000.00
7. Loss of consortium to Mr. Wilmer
 Chamberlain $ 50,000.00
 ___________
 TOTAL $500,000.00

Next the Court turns to the issue of special damages. This Court is satisfied that the past medical expenses incurred by Chad Chamberlain have been verified and total the sum of $303,206.42 as of the final date of trial. Of this total figure, the sum of $21,982.52 is included for necessary home improvements which Mr. and Mrs. Chamberlain were required to expend to prepare a place for Chad to be cared for. This Court is satisfied that this expenditure was a necessary medical expense.
Since Chad was not permanently employed at the time of his injury, there will be no award for past wage loss to the time of trial.
It then becomes necessary for this Court to assess the future medical expenses which Chad will incur as well as his future loss of earning capacity. Of vital importance in this type of case is the determination of the life expectancy of Chad from the time of trial forward. In this regard, the Court gives much weight to the testimony of Dr. Gary Glynn and Dr. Donald Judice, both of who treated and worked with Chad. It was Dr. Glynn's opinion that with "proper care" Chad may will live to the age of 50 to 55 years old. Dr. Glynn is a specialist dealing with the rehabilitation and/or after care of brain damaged victims and testified he has observed many instances were such victims have reached their 60's. Dr. Judice, though not as optimistic, admitted having encountered many people in Chad's condition who had reached their 50's having suffered brain damages at birth. In any event, because of Chad's age at the time of trial, this Court would find Chad's life expectancy to be 40 years.
Chad is receiving, what has been described by all the experts who testified, exceptional care at home. Such care, if purchased, would cost upwards of $300.00 per day. The closest comparable nursing home care would run between $80,000.00 and $120,000.00 per year. This Court is of the opinion that outside care is necessarily very near a reality. Both Mr. and Mrs. Chamberlain, now laboring 24 hours per day, 365 days per year, caring for Chad, will not be able to maintain that regime much longer from a purely physical standpoint. All of the experts agree that what is commonly referred "special nursing home care" would not be adequate for Chad's continued longevity.
Chad had not yet entered the labor market when the injury occurred. The evidence presented indicated that Chad was a rather poor student in high school. But, there was substantial evidence that Chad, like his father, enjoyed exceptional mechanical ability and had demonstrated this on many occasions by assisting his father in rebuilding and restoring automobiles. He had worked well with his father who had operated more than one successful machine shop in the local area and had encouraged Chad in this direction. The testimony of the vocational expert, Dr. Gorman, was that such work would have rewarded Chad with an average income of $30,000.00 per year in this local area.
In summation, the past medical expenses of Chad's were $303,206.42. The home care Chad received from December, 1988 through the end of September, 1989 has been testified to was worth $80,000.00 to $120,000.00 per year. This Court would award the sum of $66,500.00 for the value of the home care services which Mr. and Mrs. Chamberlain rendered from December, 1988 through September, 1989. Mrs. Chamberlain was required to spend virtually all of her time caring for Chad on a 24 hour per day basis. Mr. Chamberlain was required to sell his fishing vessels and reopen a machine shop near his home at a much reduced income. Additionally, Mr. Chamberlain was continually being called from his business at all hours during the working day to help care for Chad, thus reducing his income further.
*885 The future "personal care" of Chad Chamberlain based on his life expectancy was testified to by Dr. Gary Glynn, an expert in the care of injured persons such as Chad and these figures were projected and discounted to present value by Dr. Randy Rice. The figures were based on a life expectancy of 40 years. The doctors further made the assumption that with the continued help of Mr. and Mrs. Chamberlain, a specialist in the personal care of cases like Chad will be needed for the first 10 years. In all likelihood, as the Chamberlains reached more advanced ages they will need these specialists for two shifts per day for the next 10 years and then round the clock help thereafter. This sum discounted to present value was given as $1,971,000.00.
The necessity of future medical treatment and evaluation are also a valid projection in Chad's case. The first five years and thereafter, one hospitalization admission every three years would cost a total of $137,388.00. For physicians' services the sum of $28,431.00 was projected. The necessity of additional living arrangements over and above the money already spend would cost and additional $250,000.00 over Chad's life. The future personal and medical cared total $2,386,819.00.
This Court is satisfied from the evidence that Chad Chamberlain, because of his aptitude should have been able to easily have earned an average of $30,000.00 per year over his worklife. The projection produced a figure of $697,256.00 discounted to present value.
Recapitulating the special damages to be as follows:

1. Past medical and services $303,206.42
2. Past home care service to Mr. &
 Mrs. Chamberlain $ 66,500.00
 _____________
 SUBTOTAL $369,706.42
3. Future medical and personal care $2,386,819.00
4. Future loss of earning capacity $697,256.00
 _____________
 SUBTOTAL $3,984,075.00
 TOTAL $3,453,781.42
 _____________

The final matter to be resolved is that of intervention filed by two law firms who have represented Mr. and Mrs. Wilmer Chamberlain in the prosecution of their claims as well as the claims on behalf of Chad Chamberlain. There has been an intervention filed by Mr. Louis J. St. Martin, professional law corporation, and an intervention filed by the law firm of Porteous, Hainkel, Johnson and Sarpy.
Mr. Louis J. St. Martin intervened and filed of record his contract of employment by Mr. and Mrs. Wilmer Chamberlain. Mr. Chamberlain retained Mr. St. Martin's firm on June 18, 1987, five days following the accident of Chad Chamberlain. The employment contract appears to be standard in the profession and provides for a 33 1/3 contingency fee based on monies recovered, plus out of pocket expenses incurred by the law firm. Mr. St. Martin's firm undertook the representation of the Chamberlain, filed suit on their behalf and began preparations for trial. Mr. St. Martin's firm completed virtually all of the discovery necessary. Approximately one month prior to trial, Mr. Wilmer Chamberlain discharged Mr. St. Martin's firm and retained the firm of Porteous, Hainkel, Johnson and Sarpy to continue forward with the prosecution of the case.
The only evidence presented which gave some reason for Mr. St. Martin's dismissal and the retention of Porteous, Hainkel, Johnson and Sarpy was that Mr. Chamberlain had asked the latter to assist him with some medical insurance claims and felt the latter law firm should handle the lawsuit as well.
It is unrebutted that Mr. St. Martin's firm, during the time it prosecuted the case, did so with diligence and in a competent and professional manner. The evidence, also unrebutted, further indicated that the case was fully prepared and ready for trial. In addition, Mr. St. Martin's firm had expended the sum of $13,941.09 in legal expenses and medical which was verified and unrebutted.
It is clear to the Court that Mr. St. Martin's firm did not give Mr. Chamberlain any just cause for dismissal and handled the matter in a professional manner.
Likewise the firm of Porteous, Hainkel, Johnson and Sarpy has handled the prosecution in an equally competent and professional manner. They received the fullest cooperation of Mr. St. Martin's office in securing the entire file, including evidence and other documentation. They have proceeded through *886 bifurcated trials on liability and damages, written extensive memoranda on each of the issues and have thus far been successful in the pursuit of their client's claims. The Court must take into consideration the probability of further pursuit of the matter through the appellate system by either or both sides of this case. This would obviously require many additional hours of attorney time spent in preparation of appeals, brief writing and oral argument.
Because the plaintiffs' present attorneys were able to use the work product of Mr. St. Martin's firm, which was freely given, this reduced the trial preparation greatly. Nevertheless, they went through in effect, two trials, and will, in all likelihood proceed beyond the district court level before any final judgment is rendered. This Court believes all this would entitle the firm of Porteous, Hainkel, Johnson and Sarpy, to a greater portion of the legal fee than that of Mr. St. Martin's firm. For those reasons the Court would award the firm of Louis J. St. Martin, professional law corporation, an amount equal to 40% of the 33 1/3% contingency fee together with reimbursement of out of pocket expenses in the amount of $13,941.09.
The remainder of 33 1/3% contingency or 60% thereof is awarded to the firm of Porteous, Hainkel, Johnson and Sarpy, plus out of pocket expenses incurred.
Judgment will be rendered accordingly.
Signed, Houma, Louisiana, on this 22nd day of May, 1991.
 /s/ Paul R. Wimbish
 Paul R. Wimbish
 District Judge
 Division "E"
NOTES
[1] The Chamberlains filed a supplemental brief in this court on remand of the case requesting that we raise the general damage award to $4,000,000.00. However, although the Chamberlains did appeal the general damage award to this court, they specifically requested that we enter an award in accordance with the trial court's $2,000,000.00 award in the event that the cap was declared unconstitutional. Because we have found that the trial court's $2,000,000.00 general damage award is reasonable, we deny the Chamberlain's request to raise that award.